```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


            -against-                                    09-cr-0057 (LAK)


WILLIAM G. TROPER,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## MEMORANDUM OPINION

LEWIS A. KAPLAN, *District Judge.*

    On May 19, 2009, defendant pleaded guilty to Count Two of the Indictment, which charged him with causing thousands of notices to be mailed to individuals throughout the United States with the intent to extort money from these individuals by fraudulently threatening them with criminal charges. In the plea agreement, Troper agreed to make restitution in the amount of $950,000. The Court sentenced him in relevant part to pay the agreed restitution but imposed a very lenient payment schedule based on representations concerning Troper's ability to pay made by Troper and his attorney to the Probation Office and the Court.

    The government now has discovered that Troper had and has substantial assets. Moreover, he is attempting before a court in the Isle of Man ("IOM") to avoid enforcement of the restitution order against his assets located there on the theory that the restitution is not all now due and payable in consequence of the lenient payment schedule adopted in 2009. The matter is before the Court on the government's motion for an order requiring Troper to make immediate payment in full of his outstanding restitution.

2

*Facts*

*The Sentencing*

Troper pleaded guilty pursuant to a plea agreement to one count of violating 18 U.S.C. § 876(d). In the plea agreement, Troper and the government agreed to a loss figure of $950,000, and Troper further agreed to make restitution in that amount. The plea agreement provided that Troper would pay $154,000 towards his restitution obligation on the day he entered his guilty plea and an additional $50,000 on or before sentencing.

Prior to sentencing, the Probation Office interviewed Troper in connection with its preparation of his Presentence Investigation Report ("PSR"). According to the PSR, Troper asserted that he had been making approximately $40,000 per year as a database programmer before his arrest. The PSR indicated, however, that neither Troper nor his counsel had provided Probation with a personal financial affidavit.[1]

About a week after Probation issued the PSR, defense counsel submitted Troper's financial affidavit to the Court. Troper listed four bank accounts (at Mizrachi, Bank of America, and Chase) with total assets of $162,500, an IRA worth $35,000, stock worth approximately $90,000, personal loans totaling $50,000, and a mortgage of $75,000. Troper indicated also monthly expenses of approximately $1,290. Although Troper represented that he had no monthly cash flow, he stated: "If I can find a job, as I expect to, I will have a monthly cash flow."[2] Nowhere in his financial affidavit did Troper mention any life insurance policies or additional foreign bank accounts.

---

[1] PSR ¶ 82.

[2] Letter from Paul Shechtman to the Court (Sept. 21, 2009).

3

On October 9, 2009, this Court sentenced Troper in relevant part to pay restitution in the aggregate amount of $950,000 ($154,000 of which was paid at the time of his plea) to approximately 12,000 victims of his crime. Based on the representations of Troper and his attorney to Probation and to the Court,[3] the Court required payment of an additional $50,000 at or before sentencing and set up a payment schedule for the remaining $746,000 based on a percentage of Troper's future earned and other income.[4] The judgment required Troper to notify the Court and the U.S. Attorney of material changes in his economic circumstances.[5]

*The Expiration of Troper's Term of Supervised Release*

Troper was released from the Bureau of Prisons on August 26, 2010, at which time he commenced his one-year term of supervised release. He self-deported to Israel in November 2010.

On August 3, 2011, shortly before the scheduled expiration of the term of supervised release, Probation submitted a memorandum in support of the expiration of Troper's term of supervised release, noting that Troper "reports being a student in Israel and being supported by his

---

[3] At sentencing, Troper's attorney stated:

> "Although the loss amount is relatively high, Mr. Troper's share of the proceeds was not. . . . Most of the money went to Sussman or others who were working with him. Mr. Troper lived modestly in Israel *and has few assets now*."

DI 18 at 5-6 (emphasis added).

[4] A $49,900 restitution payment and a $100 assessment payment were made in 2009. Since then, Troper has paid only an additional $25.

[5] DI 16.

family."[6]

*Troper's Undisclosed Assets*

In or about July 2016, the government received the following information from law enforcement authorities in the IOM:

    a.    In April 2007 and January 2008, Troper purchased three life insurance policies, worth over USD $1,150,000, in the IOM from Zurich International Life Ltd. or one of its affiliates. Specifically, Troper purchased the first policy for $750,000 on April 1, 2007, and made a further credit to the same account of $94,499 on July 11, 2007. On January 1, 2008, Troper purchased the second policy for $150,000 and the third policy for $160,000. Significantly, Troper did not disclose these policies to the Court or the U.S. Probation Office in connection with his sentencing in 2009.

    b.    In July 2014, Troper surrendered two of the three policies for $301,379.73. From June 2014 to June 2016, Troper made at least five requests for partial surrender of the remaining policy and received at least $778,481.23. Troper recently has requested that the remaining policy, the approximate current value of which is $409,322.45, be fully surrendered.

    c.    Troper purchased the three policies using funds from an HSBC account he held in the IOM. There is no indication that Troper disclosed the existence of any HSBC accounts to the Court or the U.S. Probation Office. No

---

[6] DI 19.

HSBC account was disclosed on his financial statement.

The government subsequently determined from bank records that, from approximately September 2006 through March 2007, seven wire transfers totaling $663,500 were made from one of the U.S. bank accounts that Troper used to collect the fraud proceeds to three HSBC accounts in the IOM, including two transfers into the same HSBC account in the IOM that Troper used to purchase the policies.

*The Government's Efforts to Enforce the Restitution Obligation and Troper's Resistance*

On August 24, 2016, the government filed a request, pursuant to the U.S.–U.K. mutual legal assistance treaty, to enforce the restitution order to permit the repatriation of Troper's funds held in the IOM to the United States so that they may be distributed to his 11,892 victims. On or about October 9, 2016, the restitution order was registered in the IOM.

On or about November 9, 2016, Troper filed an application to cancel the registration of the restitution order in the IOM, arguing, among other things, that the restitution order is not enforceable because it is not due immediately and he is only subject to the terms of the payment schedule, which requires only a small portion to be paid monthly. The United States has represented to the IOM that it believes that the restitution order is enforceable but it is seeking an order from this Court modifying the payment schedule to make the remaining restitution due immediately. The Manx court has scheduled a hearing on the restitution order on April 4, 2017.

*Prior Proceedings*

On March 6, 2017, the government filed the present motion seeking an order making the entire remaining balance of Troper's restitution obligation, which then was approximately

6

$409,322.45 (including interest), payable in full immediately.  The Court then entered an order directing the filing of any papers in opposition to the government's motion on or before March 16, 2017.

Troper never filed any opposition papers with the Court.  The government, however, has provided the Court with a copy of an unsigned, unsworn, *pro se*[7] response to its motion that purports to be from Troper.[8]

*Discussion*

Section 3664(k) of the Criminal Code[9] provides as follows:

"A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution.  The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim.  The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances.  Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require."

While the government's application perhaps might have been more explicit, it appears to contend that (a) Troper's July 2014 surrender of two of the policies for $301,379.73 and his partial

---

[7] The document refers to a "legal opinion" from a U.S. lawyer that Troper claims to have submitted to Manx authorities.  Thus, while Troper's submission—assuming that document is what it purports to be—is *pro se* in the sense that it does not purport to have been submitted by a lawyer, it is not clear that Troper in fact is unrepresented by counsel in this matter.

[8] The purported response refers to two attachments, neither of which in fact was attached.  The government, however, has provided the Court with the purported attachments.

[9] 18 U.S.C. § 3664(k).

7

surrenders of the remaining policy in the period June 2014 through June 2016 for at least $778,481.23 were material changes in his economic circumstances, and (b) the recent revelation that Troper owned the three policies, worth over $1.15 million, that he failed to disclose at the time of sentencing is a material change in his then apparent circumstances. In either event, it contends that the Court should require immediate payment in full.

Troper's purported response makes essentially these arguments:

1. Troper obtained and submitted a "legal opinion" from a U.S. attorney, which Troper characterizes as "privileged." He contends that the "legal opinion" was transmitted by the Manx Attorney General's office[10] to the U.S. Department of Justice, that this violated Troper's attorney-client privilege, and that it was that "legal opinion" that provoked the government to make this motion.

2. While he does not dispute his failure at the time of sentencing to disclose the more than $1 million worth of insurance polices purchased during his fraudulent scheme, he seeks to justify that failure on the theory that (a) HSBC had a lien on the policies to secure a loan that Troper used to pay business debts, and (b) the policies therefore then had no value to Troper.

3. The government's portrayal of Troper's present financial condition is "one-sided." While he concedes that he owns an insurance policy worth $409,000, more than 80 percent of that amount is said to be attributable to unrealized

---

[10] Elsewhere in his submission is an acknowledgment that Troper intended to submit, and thus apparently submitted, the "legal opinion" to the Manx Attorney General's office.

capital gains, which would be sacrificed if the policy were sold. In addition, while he concedes that he now owns a business in Hungary worth $850,000, he argues that he has $750,000 of debts.

Troper's contentions are unpersuasive.

As an initial matter, Troper's response never was filed with the Court as required by the Court's order. Nor, even if it had been filed, is it signed, sworn to, or accompanied by any evidence at all save for his unsubstantiated assertions. Those alone are sufficient reasons to disregard it entirely. But the Court need not rest on that basis alone.

Troper's first argument is entirely frivolous. If, as Troper makes clear, he provided the Manx Attorney General with the "legal opinion," it lost whatever privileged character it ever enjoyed by virtue of that disclosure.[11] Moreover, Troper has failed entirely to demonstrate that the essential requisites of attorney-client privilege or work-product protection ever were satisfied with respect to the "legal opinion."

Troper's attempt to justify the failure to disclose his ownership of over $1 million in insurance policies—and his silence as his lawyer represented to the Court that he had "few assets"—on the theory that HSBC had a lien on the policies to secure an unspecified loan with an undisclosed balance is risible. Troper's obligation was to disclose his assets and his liabilities. He disclosed neither the insurance policies, the HSBC accounts, nor the alleged liability to HSBC on the financial statement he submitted to the Court, which was made under penalty of perjury. His obligation assuredly was not satisfied by deciding privately that the policies were of no value because Troper's undisclosed liability to HSBC, payment of which they supposedly secured,

---

[11] *See, e.g.*, *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003).

exceeded the value of the insurance. That was a judgment to be made by others based on full disclosure of all material information.[12]

Troper's third argument is equally flawed. The Court has no evidence—apart from Troper's unsigned, unsworn assertion—that the conceded $409,000 cash value of the remaining policy is not entirely available to him. He has not submitted the policy. Moreover, he claims only that the portion of the value attributable to unrealized capital gains would be lost in the event the policy were sold, not that he does not have the right to surrender the policy and to obtain the full $409,000.

Finally, the fact remains—and it is undisputed—that Troper received over $1 million from surrenders or partial surrenders of these policies in the period June 2014 through June 2016. That alone was a material change in Troper's economic circumstances that presumably would, and

---

[12]  Troper does not contest the government's implicit contention that the material change in Troper's apparent financial situation, attributable to Troper's concealment of assets, justifies relief under 18 U.S.C. § 3664(k).

In *United States v. Grant*, the Second Circuit left undecided the question whether "the subsequent discovery of assets concealed by a defendant would constitute a material change in circumstances." 235 F.3d 95, 101 (2d Cir. 2000). In dicta, however, the court noted that "[s]urely, . . . there would be a remedy that would permit the gathering of assets that were unknown to the authorities as the result of a defendant's dishonesty." *Id.*

Recently, the Tenth Circuit was faced with the scenario contemplated in *Grant* and concluded that, where "the court finds that a defendant failed to disclose (or knowingly concealed) assets at sentencing that would affect his ability to pay restitution, on later discovery of those assets, the court may modify its order of restitution as the interests of justice require pursuant to 18 U.S.C. § 3664(k)." *United States v. Grigsby*, 665 F. App'x 701, 708 (10th Cir. 2016).

This Court agrees with the Tenth Circuit. The point, however, is unnecessary to the result because there has been a material change in Troper's economic circumstances in addition to discovery of previously undisclosed or concealed assets.

10

certainly might, affect his ability to pay restitution.[13]  Moreover, the interests of justice would best be served by obtaining and distributing to Troper's victims such assets as may be available as a result of enforcement of the restitution order against such assets as Troper may have in the IOM, as those victims have a far greater claim on those assets than does this convicted fraudster.

*Conclusion*

The government's motion is granted.  The Court will sign and file the government's proposed order promptly.

SO ORDERED.

Dated:      March 28, 2017

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[13] *See United States v. Grant*, 235 F.3d 95, 101 (2d Cir. 2000) (finding a material change in defendant's circumstances where funds in previously unknown account became available after original judgment of conviction and sentence).